*UNITED STATES DISTRICT COURT*

*DISTRICT OF MAINE*

| | | |
|---|---|---|
| BARRY CURTIS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket No. 05-130-P-H |
| | ) | |
| RYDER TRUCK RENTAL, INC., | ) | |
| | ) | |
| Defendant | ) | |

*RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

The defendant, Ryder Truck Rental, Inc., moves for summary judgment on all counts of the complaint in this action that was removed from the Maine Superior Court (Cumberland County). I recommend that the court grant the motion.

**I. Summary Judgment Standards**

**A. Federal Rule of Civil Procedure 56**

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving

1

party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See*

*id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II.  Factual Background

The plaintiff filed no response to the statement of material facts submitted by the defendant in support of its motion for summary judgment.  Accordingly, all of the facts stated in the defendant's submissions must be deemed admitted, to the extent they are supported by the citations given to the record.  Local Rule 56(f).[1]   The relevant facts are set forth below.

---

[1] The plaintiff states as follows in the first paragraph of his memorandum of law submitted in opposition to the motion for summary (*continued on next page*)

3

The defendant operates a truck service repair, lease and rental center (the "Center") in Portland, Maine. Defendant's Statement of Material Facts ("SMF") (Docket No. 14) ¶ 1. It employs service technicians and customer service coordinators, among others. *Id*. ¶ 2. The plaintiff was employed by the defendant as a customer service coordinator from August 14, 1997 to May 19, 2004. *Id*. ¶ 15. The plaintiff acknowledged receiving a copy of the defendant's employee handbook on October 12, 2001. *Id.* ¶ 3. The handbook included express policies on sexual and other harassment and the defendant's rules on business actions for all employees entitled "Principles of Business Conduct." *Id*. ¶ 4. The defendant acknowledged receiving a separate copy of the defendant's Principles of Business Conduct on April 15, 2004. *Id*. ¶ 17.

The defendant was instructed to read the employee handbook and to raise any questions he had with management. *Id*. ¶ 4. The handbook expressly prohibits both illegal harassment and a variety of other behavior the defendant considers inappropriate in the workplace. *Id*. ¶ 5. The handbook directs any employee who believes that he or she is the subject of illegal harassment or other inappropriate conduct both to tell the offending party to stop the offending behavior, if possible, and to report the offensive conduct so that the defendant "can take the necessary steps to rectify the situation." *Id*. The defendant's "Principles of Business Conduct" state that an employee must report to the defendant any knowledge of any act of misrepresenting or misreporting or other act of intentionally falsifying any company record. *Id*. ¶ 7. The handbook and the Principles provide several different ways in which to make such a report or complaint. *Id*. The handbook provides multiple ways, including reporting

---

judgment: "The Plaintiff agrees in large part with Ryder's recitation of the facts, except that the Plaintiff did not testify that Scott Maranian only teased him two or three times, as asserted by the Defendant on page 3 of its Motion for Summary Judgment. Rather, the Plaintiff stated that the harassment by Maranian went on for a sustained period of time and constituted Maranian's way of saying good morning to him. (Curtis deposition, page 69, lines 17-21)." Plaintiff's Opposition to Defendant's Motion for Summary Judgment, etc. ("Opposition") (Docket No. 22) at 1. This attempted controverting of an unspecified entry or entries in the defendant's statement of material facts fails utterly to comply with Local Rule 56(c) and will not be considered by the court. Counsel's failure to comply with Local Rule 56, available on the court's web site, has also resulted in the court's investment of substantial time and effort in checking the supporting citations given by the defendant for each and every material fact mentioned in this opinion, an exercise that (*continued on next page*)

outside an employee's chain of command, in which a complaint or concern of sexual harassment or any other form of illegal or unacceptable conduct can be raised with the defendant and prohibits retaliation or any adverse action against a party who makes a good faith report of harassment. *Id.* ¶ 10.

The defendant posts in its workplace the printed form provided by the Maine Human Rights Commission which contains a statement that sexual harassment is illegal, provides descriptions of improper conduct and describes how to file a complaint with the Commission. *Id.* ¶ 12. The poster also states that retaliation for reporting sexual harassment is unlawful. *Id.*

The defendant's policies forbid an employee to share his or her password for computer access with other employees or to permit another employee to make computer entries using that employee's password. *Id.* ¶ 13.

Throughout his employment with the defendant, the plaintiff was covered by the defendant's workers' compensation insurance approved by the Workers' Compensation Board. *Id.* ¶ 14.

On of the plaintiff's primary responsibilities as a customer service coordinator was to assure that all parts that were used to service or repair a truck were assigned to the appropriate truck on the appropriate repair order. *Id.* ¶ 18. He was responsible for properly recording and issuing invoices on parts. *Id.* ¶ 49. On or about April 30, 2004 a manual inventory was taken of the truck parts and supplies at the Center which disclosed numerous discrepancies between computer records of parts and supplies and the actual physical count. *Id.* ¶ 20. Such discrepancies often occur and had occurred on prior physical inventories. *Id.*

After the physical inventory, from May 3, 2004 to May 18, 2004, numerous inventory adjustments were made using the plaintiff's password, including allocating several hundred parts to specific repair orders. *Id.* ¶ 21. From May 5, 2004 to May 19, 2004 Robert Taylor worked at the

---

would not have been necessary if the plaintiff had complied with the local rule.

Center as a customer service coordinator for parts. *Id.* ¶ 19. Many adjustments were made by the plaintiff and some were made by James Shedd, Tire Responsible Person, and by Taylor. *Id.* ¶ 21. Many of the adjustments were facially incorrect, because (i) the parts were assigned to repair orders on trucks on which those parts could not be used; or (ii) an excessive number of a specific part was assigned to have been used on a single day; or (iii) there were other similar circumstances. *Id.* ¶ 22.

On May 19, 2004 Scott Maranian, the Center's general manager; Rich Silva, the defendant's Regional Parts Logistics Manager; and Ray Cote, a Parts Logistics Leader, met with the plaintiff and Taylor to discuss the audit and inventory entries. *Id.* ¶ 23. At the meeting, the plaintiff and Taylor were asked to explain many of the parts entries shown on the Center's records for the period from May 1 to May 19, 2004. *Id.* Taylor did not respond. *Id.* The plaintiff stated that he had not made many of the entries, that other employees had used his password to make entries and that he had just done what he was told to do. *Id.* Maranian told the plaintiff and Taylor that they were terminated effective May 18, 2003 for unacceptable performance and violation of the Principles of Business Conduct. *Id.* ¶ 24.

The plaintiff knowingly misreported or misrecorded parts usage in the defendant's records. *Id.* ¶ 25. He knew that such actions were serious misconduct for which he could be terminated. *Id.* ¶ 26. At the time of his termination the plaintiff did not claim that there had been any improper conduct directed toward him in the workplace or that he believed he was at any risk of physical injury. *Id.* ¶ 27. At that time he did not report that he had been harassed or otherwise improperly treated at work. *Id.* ¶ 31. He did state that he objected to his termination, but he did not file a complaint with the defendant or any other party. *Id.*

After the May 19, 2004 meeting, Shedd, the person responsible for tire inventory at the Center, told Maranian that the plaintiff had told him that the plaintiff was fired for letting another employee use his password. *Id.* ¶ 46. Maranian responded that the principal reason for the plaintiff's termination

6

was knowingly making false entries or permitting them to be made in order to make the records look better, in violation of the defendant's business ethics and rules concerning inventory and record keeping. *Id*. Shedd was the only Ryder employee with whom Maranian discussed the plaintiff's termination. *Id*. ¶ 47. He told Shedd the reason for the plaintiff's termination because Shedd had been involved in the manual inventory with the plaintiff and Shedd needed to know that his job was not in jeopardy, while at the same time reminding Shedd that knowingly falsifying records would result in termination. *Id*. The plaintiff did not complain to anyone at Ryder about any alleged disclosure of the reason for his termination. *Id*. ¶ 48.

The plaintiff never filed a workers' compensation claim or first notice of injury, nor did he miss any work, due to any comments made or actions taken regarding the length of his hair. *Id*. ¶ 28. He never missed any work because of any of the incidents alleged in his complaint. *Id*. ¶ 29. He received pay raises and generally favorable performance evaluations when he worked for the defendant. *Id*. ¶ 30. He got along pretty well with almost everyone when he worked for the defendant and was generally well liked. *Id*. ¶ 33.

The plaintiff had longer hair than the average male employee at the Center. *Id*. ¶ 35. On occasion he was teased about the length of his hair by his co-workers. *Id*. ¶ 34. On several occasions the plaintiff was referred to as David Cassidy or Ted Nugent because of the length of his hair. *Id*. ¶ 37. The plaintiff never objected to such statements by Maranian or reported any concern or complaint about them to anyone at the defendant. *Id*. ¶ 43.

On one occasion Joe Gallagher, a co-worker, grabbed the plaintiff's hair and, using scissors, threatened to cut it off. *Id*. ¶ 39. The plaintiff was unhappy about Gallagher's action. *Id*. Maranian spoke to Gallagher, who stated that he had been kidding. *Id*. Maranian told Gallagher that even if such conduct was in jest it was unacceptable and if it occurred again Gallagher would be terminated.

*Id*. This was the only incident of alleged harassment about his hair that the plaintiff reported or complained about. *Id*. ¶ 40. No similar conduct ever occurred again, nor was there any further incident between the plaintiff and Gallagher. *Id*. ¶ 41.

In April 2004 the plaintiff received a written warning from his supervisor, Roger Chasse, for "failing to process invoices and purchase orders correctly." *Id*. ¶ 50. On or about April 6, 2004 Chasse told Taylor that the plaintiff had been given a written warning for this reason. *Id*. ¶ 51. Chasse supervised both Taylor and the plaintiff, who were both customer service coordinators. *Id*. The form which contained the written warning is captioned Progressive Discipline Form and has the word "Confidential" set out in the upper right hand corner. *Id*. ¶ 52. Chasse told Taylor about the warning he had given to the plaintiff to be sure that Taylor understood the type of conduct expected of him and what was improper performance, as well as the extent of discipline for it. *Id*. ¶ 54. He did not disclose the warning to anyone other than Taylor. *Id*. ¶ 55. The plaintiff never complained of or reported any violation of his privacy regarding the disclosure of the written warning to Taylor. *Id*. ¶ 53.

James Varney was a service island attendant employed at the Center. *Id*. ¶ 56. He was a member of a union that represents the service technicians at the Center. *Id*. ¶ 57. In September 2003 Chasse asked the plaintiff to ask Varney, who was in the truck repair area, to wash a truck. *Id*. ¶ 58. The plaintiff reported to Chasse that he believed Varney was upset and did not want to wash the truck. *Id*. ¶ 59. Chasses told the plaintiff to tell Varney to wash the truck, which the plaintiff did. *Id*. Shortly after the plaintiff made this request, Varney got into a truck and drove in the direction of the plaintiff and Michael Landry, a co-worker. *Id*. ¶ 60. The plaintiff reported the incident to Chasse asserting that Varney had tried to run the plaintiff over to kill him. *Id*. ¶ 61. Ryder conducted an immediate investigation. *Id*. ¶ 62. Varney denied that he ever intended or tried to run the plaintiff

over. *Id*. ¶ 61. Landry stated that he did not believe that Varney was trying to run him or the plaintiff over. *Id*. ¶ 63. The defendant's management determined that the evidence was not conclusive but that Varney's actions deserved discipline. *Id*. ¶ 64. Varney was suspended without pay for three days and given a written warning that if any conduct similar to that claimed by the plaintiff occurred Varney would be terminated. *Id*.

The plaintiff was told of the outcome of the investigation and Varney's discipline. *Id*. ¶ 65. The union agreed not to grieve Varney's discipline. *Id*. ¶ 66. No other incidents occurred between Varney and the plaintiff. *Id*. ¶ 67. The plaintiff never filed a complaint or raised any concern about Varney thereafter, not did he ever report any other act of intimidation or that he felt that his safety in the workplace was threatened. *Id*.

In May 2002 Kent Sadak, a technician at the Center, was accused by a co-worker of intentionally breaking an air gun. *Id*. ¶ 69. Management undertook an investigation. *Id*. ¶ 70. As part of the investigation the plaintiff was asked to write a report of what he knew of the incident. *Id*. ¶ 72. The plaintiff wrote and submitted a report. *Id*. ¶ 73. To the extent that other employees learned of the report or its content, the defendant does not know how that occurred. *Id*. ¶ 75. The plaintiff never objected to any aspect of the investigation or reported any concern that anyone else had been made aware of his written statements concerning Sadak's conduct. *Id*. ¶ 79.

### III. Discussion

The complaint asserts claims of violation of the plaintiff's civil rights under Maine law and intentional or negligent infliction of emotional distress (Count One), invasion of privacy (Count Two) and hostile work environment based on sexual harassment (Count Three). Complaint (included in Docket No. 1) ¶¶ 12-20.

### A.  Count One

Count One of the complaint alleges that the defendant violated the plaintiff's civil rights by "allowing James Varney to almost kill" him and "only giving [Varney] a very mild punishment" and by "basically [giving] other employees the right to attack" the plaintiff "with little or no provocation." It alleges that the defendant inflicted emotional distress on the plaintiff through "the emotional trauma of almost being killed" and by threatening him with termination "when, as was later proven, he was telling the truth." Complaint ¶¶ 13-14.

The defendant contends that these claims are barred by the Maine Workers' Compensation Act and, in the alternative, that the plaintiff cannot prove either claim. Defendant's Motion for Summary Judgment, etc. ("Motion") (Docket No. 13) at 8-11. Under the Act, an employer who has secured workers' compensation coverage is exempt from civil actions "involving personal injuries sustained by an employee arising out of and in the course of employment." 39-A M.R.S.A. § 104. This exclusivity provision covers claims for intentional infliction of emotional distress, *Cole v. Chandler*, 752 A.2d 1189, 1196 (Me. 2000), and for negligent infliction of emotional distress, *Li v. C.N. Brown Co.*, 645 A.2d 606, 607, 609 (Me. 1994). The summary judgment record establishes that the defendant in this case had workers' compensation coverage in place at all relevant times, SMF ¶ 14, and that the incidents giving rise to any possible claims of negligent or intentional infliction of emotional distress raised by the complaint arose out of and in the course of the plaintiff's employment with the defendant. The plaintiff admits that the incidents in this case so arose. Opposition at 2. The defendant is accordingly entitled to dismissal of any claims for intentional or negligent infliction of emotional distress.

The plaintiff does argue, albeit briefly, that a claim under the Maine Civil Rights Act is not barred by 39-A M.R.S.A. § 104. Opposition at 2-3. Neither of the cases cited by the plaintiff in

support of this assertion addresses this issue, however. *See Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973 (Me. 1996), and *King v. Bangor Fed. Credit Union*, 611 A.2d 80 (Me. 1992). In *King v. Bangor Fed. Credit Union*, 568 A.2d 507 (Me. 1989), the Maine Law Court held that the Maine Workers' Compensation Act and the Maine Human Rights Act "were created for very different purposes" and that a waiver of claims under the Workers' Compensation Act did not waive claims under the Maine Human Rights Act. 568 A.2d at 508-09. The Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.*, is not the act under which the plaintiff's claim is raised, however. The plaintiff invokes the Maine Civil Rights Act, 5 M.R.S.A. § 4681 *et seq.* Complaint ¶ 13; Opposition at 3. Assuming *arguendo* that the Maine Law Court would rule in a similar fashion regarding the intersection of the Maine Civil Rights Act and the Maine Workers' Compensation Act, an issue which that court does not appear to have addressed, the result in this case is the same as that for the plaintiff's claims of intentional and negligent infliction of emotional distress.

On the merits, the defendant contends that the plaintiff "fails to show that Defendant took any action toward Plaintiff 'through force or violence.'" Motion at 9. This is a reference to 5 M.R.S.A. § 4682, the section of the Maine Civil Rights Act that defines the scope of private actions under the Act. That statute provides, in relevant part:

> Whenever any person, whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State . . ., the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

11

5 M.R.S.A. § 4682(1-A).  In response to the defendant's argument, the plaintiff admits that "Ryder itself did not directly threaten the Plaintiff with force or violence," but asserts that "its response to the incident [involving Varney] constituted a threat to the Plaintiff's physical well-being." Opposition at 1.  He goes on to state that "Ryder's violation of Mr. Curtis' rights is in its failure to report Mr. Varney to the police." *Id*. at 2.[2]  He asserts that suspending Varney for three days "is not likely to be a significant deterrent to a repeat of such conduct." *Id.*

The plaintiff seeks to stretch the language of section 4682 much too far.  In the absence of any evidence suggesting that Varney was likely to engage in the same conduct again, the plaintiff's argument that the defendant's failure to report it to the police constituted "a threat to the Plaintiff's physical well-being" falls of its own weight.  Even if that were not the case, there is no evidence to suggest that Varney's alleged actions were within the scope of his employment by the defendant or were induced or adopted by the defendant.  In the absence of such evidence, the alleged actions cannot be considered to be those of the defendant.  The language of section 4682 is clear: the defendant must be the party who, by force or violence, interferes with or attempts to interfere with a plaintiff's exercise of his civil rights.  The evidence in the summary judgment record must be interpreted with the benefit of all reasonable inferences in favor of the party opposing summary judgment, but the inferences necessary to support the plaintiff's position on this issue cannot be described as reasonable. The defendant is entitled to summary judgment on this aspect of Count One as well.

### B.  Count Two

Count Two alleges that the defendant violated the plaintiff's right to privacy in May 2001 "when [the plaintiff] reported Mr. Kent; on April 6, 2004, when Robert Taylor was informed of

---

[2] There is no evidence of this alleged failure to report the Varney incident to the police in the summary judgment record. This omission alone is fatal to the plaintiff's argument. I will nonetheless address the argument on its merits because I conclude that, even if the evidence had been presented, the plaintiff's argument would fail.

Curtis' writeup by Roger Chasse; and on May 18, 2004 and subsequently, when the alleged cause of [the plaintiff's] firing was published to other employees." Complaint ¶ 17. Maine law recognizes four distinct kinds of invasion of privacy: (i) intrusion upon a plaintiff's physical and mental solitude or seclusion; (ii) public disclosure of private facts; (iii) publicity which places the plaintiff in a false light in the public eye; and (iv) appropriation for the defendant's benefit or advantage of the plaintiff's name or likeness. *Estate of Berthiaume v. Pratt*, 365 A.2d 792, 795 (Me. 1976). Only the second kind is implicated in this case.

The defendant contends that the first of these incidents, an apparent reference to paragraph 6 of the complaint, cannot constitute an invasion of privacy as that claim is defined in the Restatement (Second) of Torts, Motion at 14-16, a definition which has been adopted by the Maine Law Court, *Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977). The plaintiff responds that he "concedes that it cannot be determined who is responsible for revealing to Kent Sadack [sic] that the Plaintiff and another employee had submitted statements about Sadack [sic] allegedly breaking an air gun." Opposition at 6. The first problem for the plaintiff is that the only statement of facts before the court does not establish that anyone revealed anything to Sadak. *See* SMF ¶¶ 69-79. His further assertion that the information which he submitted about this incident, *id*. ¶¶ 72-73, was submitted "with an assurance to the Plaintiff that the information would be kept private," Opposition at 6, is similarly unsupported in the summary judgment record. The only information properly before the court that refers in any way to a disclosure of information that the plaintiff may have provided to the defendant about the incident involving Sadak is that presented in paragraph 75 of the defendant's statement of material facts: "to the extent that other employees learned of Plaintiff's report or its contents, Defendant does not know how that occurred." SMF ¶ 75. This is insufficient to establish that any disclosure occurred. In the absence of any evidence of a disclosure, this incident cannot constitute an

13

invasion of privacy. In addition, if the plaintiff means to allege an invasion of privacy by disclosure of private facts,[3] that disclosure must be public. *Rush v. Maine Sav. Bank*, 387 A.2d 1127, 1128 (Me. 1978) (disclosure to IRS not public disclosure). The plaintiff appears to be concerned only with an alleged disclosure to Sadak, Opposition at 6, — again, an alleged disclosure of which there is no evidence in the summary judgment record — which by definition cannot be a public disclosure. *See Stokes v. Barnhart*, 257 F.Supp.2d 288, 295 (D. Me. 2003). The publicity given to the private matter with respect to the second type of invasion of privacy must also be "of a kind that would be highly offensive to a reasonable person." *Loe v. Town of Thomaston*, 600 A.2d 1090, 1093 (Me. 1991). Evidence of that element of the definition is missing from the summary judgment record as well.

With respect to Chasse's alleged disclosure to Taylor, the second incident of invasion of privacy alleged in the complaint, the defendant contends that the disclosure was made only to Taylor and thus cannot have been a public disclosure. Motion at 12. The plaintiff responds that "the entire scope of the dissemination of" the fact that he had been given a written warning was wider than just a disclosure to Taylor. Opposition at 4. He then recites several facts which are not included in the only statement of material facts before the court in connection with this motion for summary judgment. *Id.* at 4-5. *See* SMF ¶¶ 50-55. Without those facts, the plaintiff's argument fails. Even if that were not the case, I note that the plaintiff fails to cite any authority for his assertion that the "finite number of individuals" working for a single company can constitute the "public" for purposes of this kind of invasion of privacy. The case law cited above suggests otherwise. In any event, the plaintiff's failure to submit evidence in support of its novel interpretation of this tort makes it unnecessary to consider the defendant's alternate argument based on qualified privilege. Motion at 13-14.

---

[3] A "private fact" for purposes of the second kind of invasion of privacy is a fact "about one's intimate person, or secrets." *MacKerron v. Madura*, 445 A.2d 680, 682 (Me. 1982). The only possible "private fact" connected with the Sadak incident is the fact that the plaintiff submitted a report about the incident to the defendant.

14

The final incident alleged by the plaintiff to have constituted invasion of privacy is the disclosure by Maranian to Shedd of the reason for the plaintiff's termination. Opposition at 6. The plaintiff asserts that "[t]here was no need to do this." *Id*. That is not an element of the tort. Again, disclosure to a single individual is not sufficient to establish public disclosure, which is an element of the tort at issue. The plaintiff does not respond to this aspect of the defendant's argument. He suggests other things that the defendant might have done short of telling Shedd why the plaintiff had been terminated, but the fact that other things could have been done has no bearing on whether there is sufficient evidence in the summary judgment record to allow a reasonable factfinder to conclude that an invasion of privacy of the second type has occurred. This makes it unnecessary to consider the defendant's arguments concerning the existence of a conditional privilege and that the exclusivity provision of the Maine Worker's Compensation Act applies to these claims as well. Motion at 16-19.

The defendant is entitled to summary judgment on Count Two.

### C.  Count Three

Count Three alleges that the defendant "permitted a hostile work environment for [the plaintiff] by allowing the sexual harassment of him to continue unchecked for years." Complaint ¶ 19. The only specific incident mentioned in the complaint is the one involving Gallagher's remarks about his hair. *Id*. ¶ 20. The defendant contends that the plaintiff has not offered evidence that is capable of proving the elements of a hostile environment sexual harassment claim and that his failure to report the alleged harassment also defeats his claim. Motion at 19-24.

The complaint cites only the regulations of the Maine Human Rights Commission in support of its allegations in Count Three. Complaint ¶ 19. The defendant assumes that the complaint asserts only a state-law claim, Motion at 19, and the plaintiff does not dispute this assumption, Opposition at 9-11. I will accordingly confine my analysis to the application of Maine law.

15

Under Maine law, it is unlawful employment discrimination

> [f]or any employer . . . because of race or color, sex, sexual orientation, physical or mental disability, religion, age, ancestry or national origin . . . to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment . . . .

5 M.R.S.A. § 4572(1)(A).

In order to prevail on a sexual harassment claim based on a hostile work environment, a plaintiff must prove

> 1) that she (or he) is a member of a protected class; 2) that she was subjected to unwelcome sexual harassment; 3) that the harassment was based upon sex; 4) that the harassment was sufficiently severe or pervasive as to alter the conditions of plaintiff's employment and create an abusive work environment; 5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and 6) that some basis for employer liability has been established.

*Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001)).[4] With respect to the fourth requirement:

> Hostile environment claims involve repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment. In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. While harassment may be actionable even if it only occurred one time, the inappropriate conduct must be severe enough to cause the workplace to become hostile or abusive.

*Doyle v. Department of Human Servs.*, 824 A.2d 48, 56 (Me. 2003) (citations and internal quotation marks omitted).

The plaintiff asserts that

---

[4] Maine courts have relied on federal case law concerning similar federal claims for the purpose of construing and applying the provisions of the Maine Human Rights Act, including section 4572. *See, e.g., Bowen v. Department of Human Servs.*, 606 A.2d (*continued on next page*)

16

> allegations of being referred to as a girl; being referred to by the names of other long-haired males; having his hair grabbed and threatened to be cut off; and being repeatedly and needlessly mocked by the General Manager could, if believed, enable the finder of fact reasonably to believe that sexual harassment had taken place.

Opposition at 9. The problem for the plaintiff is that evidence of most of these "allegations" is not present in the summary judgment record. The only evidence in the summary judgment record possibly relevant to this claim is that the plaintiff was occasionally teased about the length of his hair by his co-workers, that he had longer hair than the average male employee at the Center, that on several occasions he was referred to by unidentified persons in an unidentified location as David Cassidy or Ted Nugent because of his hair length and that Gallagher, a co-worker, once grabbed his hair and threatened to cut it off with scissors, the only such incident which the plaintiff reported to the defendant. SMF ¶¶ 34-37, 39-40. The summary judgment record also contains the statement that the plaintiff "has asserted that Scott Maranian teased [him] about the length of his hair." *Id*. ¶ 43. There is no evidence that the plaintiff was "referred to as a girl" or "repeatedly and needlessly mocked by" Maranian.

Being called by the names of other long-haired males cannot reasonably be construed as harassment based on sex. Giving the plaintiff the benefit of possible inferences that the Gallagher incident was based on the plaintiff's gender, and that teasing by Maranian about the length of his hair was also based on his gender, the plaintiff has not offered enough evidence to allow a reasonable factfinder to conclude that the harassment was "so severe as to cause the environment [at the Center] to become hostile or abusive" in the view of a reasonable person. *Nadeau*, 675 A.2d at 976. The Gallagher incident and an indeterminate amount of teasing about the length of the plaintiff's hair by Maranian, taken together, would not allow a reasonable factfinder to conclude that the conditions of

---

1051, 1053 (Me. 1992).

17

the plaintiff's employment were altered thereby to the extent that the work environment became abusive. *See Blake v. State*, 868 A.2d 234, 238 (Me. 2005).

This failure of proof makes it unnecessary to consider the defendant's alternative argument, Motion at 22-24, that the plaintiff's claim is barred by his failure to report the alleged harassment.[5]

### IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion for summary judgment be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 13th day of March, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

---

[5] Were I to reach this issue, I would not consider the facts offered in opposition by the plaintiff only in his memorandum of law. Opposition at 9-11.